# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs September 18, 2012

## STATE OF TENNESSEE v. ROBERT EUGENE CRAWFORD, JR.

**Appeal from the Criminal Court for Sullivan County**
No. S56314    Robert H. Montgomery, Jr., Judge

**No. E2012-00001-CCA-R3-CD - Filed August 19, 2013**

The Defendant, Robert Eugene Crawford, Jr., was convicted by a Sullivan County jury of aggravated child abuse and aggravated child neglect. The trial court imposed consecutive terms of twenty-five years for each of these convictions. In this direct appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his statements to the police; (2) he was entitled to disclosure of grand jury materials; (3) reenactment photographs of the abuse were improperly admitted into evidence; (4) he should have been permitted to conduct individual voir dire of the potential jurors; (5) the trial court improperly limited his cross-examination of two witnesses; (6) his investigator should have been permitted to testify as a lay witness about the Defendant's susceptibility to suggestion and the investigation techniques used; (7) he should have been allowed to present evidence from his mental evaluation about his reading comprehension difficulties; and (8) the trial court made several erroneous sentencing determinations, including the denial of his right to allocution, the length of the sentences imposed, and the imposition of consecutive sentencing. Following our review of the record and the applicable authorities, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Ilya I. Berenshteyn, Bristol, Tennessee, for the appellant, Robert Eugene Crawford, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Teresa A. Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

By presentment returned on February 26, 2009, a Sullivan County grand jury charged the Defendant with separate counts of aggravated child abuse and aggravated child neglect, both involving his newborn son. See Tenn. Code Ann. § 39-15-402. The offenses were alleged to have been committed on or about June 8, 2008, to June 9, 2008. The Defendant does not challenge the sufficiency of the convicting evidence on appeal; therefore, we provide only a brief summary of the facts underlying the Defendant's convictions and those which are necessary for a determination of the issues on appeal.

The evidence at trial revealed the following facts. The victim's date of birth was May 29, 2008, and the Defendant signed the victim's birth certificate. At the time the victim was born, the victim's mother and the Defendant were not married. After returning home from the hospital, the Defendant began to question the paternity of the victim and started calling the victim a "monk-monk," meaning that the child was of Mexican heritage. The Defendant stated in the victim's mother's presence, "I wonder what would happen if I threw him up against a wall." She testified that she thought he was joking at the time.

Prior to Sunday, June 8, 2008, the victim acted "like a normal baby"; he had been to his "well baby check up" and everything was "fine." According to the victim's mother, June 8 began like a "regular day." She was at home with her two children, the victim and her fifteen-month-old daughter, and Deanna Jennings ("Deanna"), who also lived with the family in the Kingsport apartment. The Defendant was home because he did not have to work that day. During the evening hours, the victim started crying, which the victim's mother described as different than a "normal newborn baby cry[,]" a "screaming cry like he was really hurting." She gave him "gastro drops" in an effort to ease his pain. According to the victim's mother, the crying lasted for an hour or so and stopped only after both she and the Defendant held the victim and walked him around, "patting his butt." She recalled that she did not go to bed until "late" that evening.

The victim's mother testified that, around 4:00 or 5:00 a.m. the next morning, Monday, June 9, the victim woke up again. She said that the Defendant "got up with [the victim]. . . and was feeding him and trying to get him to go to sleep[.]" She awoke when she "heard a loud screaming cry" and went to help the Defendant get the victim back to sleep; the victim "finally" went back to sleep. When the victim awoke at 10:00 or 10:30 a.m. on June 9, 2008, he hardly ate and his skin "was yellow, like he had jaundice." She asked the Defendant "to look and see what he thought" about the victim, and the Defendant said, "He looks like he's half dead." After that, the victim was "just fussy," and he continued not to eat very much throughout the day and slept "off and on."

They left the apartment and went to the store and Deanna's mom's house; the victim fell asleep in his carseat. When they got home later that afternoon, she took the victim out of his carseat and noticed severe swelling and bruising on the left side of the victim's head and that his eye was "slanted" to where he could barely open it. She then took the victim to the hospital, where she was unable to explain the victim's injuries upon arrival. The victim's mother asserted that she had never done anything to harm the victim and that she had never seen anyone else harm the victim.

Deanna, who was thirteen years old in June 2008, testified at trial about the events surrounding the victim's injuries, including the victim's cries and when she and the victim's mother discovered the victim's injuries. She also heard the Defendant make racial slurs against the victim; ask aloud, "What would happen if I threw him up against the wall"; and following the victim's injuries, say that he was "probably half dead." Deanna also testified that she had never done anything to harm the victim and that she had never seen anyone else harm the victim.

An investigation into the victim's injuries ensued. Detective Todd Ide of the Kingsport Police Department went to the hospital on June 9, 2008, and interviewed the Defendant. In the statement the Defendant gave to Det. Ide, the Defendant stated that he had gone to visit his wife in Hawkins County on June 9, 2008, when his sister called him and said that the victim was in the hospital. He stated to Det. Ide that he then came to the hospital, where he was informed of the victim's injuries.

The following day, June 10, 2008, Detective Melanie Adkins of the Kingsport Police Department went to the hospital, where she interviewed the Defendant, the victim's mother, and the treating physician. Det. Adkins obtained written statements from both the Defendant and the victim's mother at that time. In the days that followed, Det. Adkins spoke with the victim's mother several more times, and she spoke with the Defendant again on June 11 and 12, taking additional statements from him on those days.

The June 10 statement was read for the jury. In that statement, the Defendant said that he noticed the victim was "yellow" the previous day and that he asked the victim's mother if she wanted to take him to the emergency room, but she wanted to wait. The Defendant left, going to visit his wife, when he received a call from his sister that the victim's mother was taking the child to the hospital because "his ear was going to fall off."

In the June 11 statement, the Defendant stated that he had not been around the victim "for a couple days because something happened[,]" that he had done "something to [the victim] on Sunday and it scared" him. He explained to Det. Adkins that he had argued with the victim's mother that day because she believed he was going to leave her and go back to his wife. He also stated that he needed "counseling" for his bipolar disorder and that he was

not taking his proper medication. The Defendant then admitted that he "hurt" the victim, "jerk[ing]" the child out of his carseat and hitting his head against a wall. The Defendant described that the victim's head "snapped back" when it came into contact with the wall. He noticed that the victim was acting differently and that his head was yellow before leaving to visit his other child. He blamed the incident on being tired and under stress.

In the final interview on June 12, 2008, the Defendant again admitted to hitting the victim's head on a concrete wall. He described it as a "hard hit" and acknowledged that he did not tell the victim's mother what he had done. He said that he did not tell anyone about his actions because "most people would beat the s--t out of" him. He also stated that he had not been coerced into giving a statement. He claimed that it was "just an accident out of anger" and that he did not intend to hurt the victim. The Defendant demonstrated his actions for the police, which were photographed, and the photographs were admitted into evidence.

Following the victim's arrival at the hospital, it was determined that the victim suffered "bilateral fractures of the skull" and several areas of bleeding in the brain. The victim was placed in the neonatal intensive care unit because his condition was "highly unstable and critical" and there was a substantial risk of death. The swelling in the brain led to "seizure activity[,]" and the victim suffered "protracted or substantial impairment of cognitive functioning or mental faculties" while at the hospital. The victim was put on life support on more than one occasion, and a feeding tube was inserted. On June 18, 2008, the victim was transferred to another hospital for further treatment, where he stayed, according to the victim's mother, for an additional fifteen to twenty days.

The treating physician, Dr. Amirah Daher, opined that the victim's injuries were "non-accidental" or "[b]lunt trauma." She further confirmed that the injuries were consistent with an adult slamming the victim's head into a concrete wall. According to Dr. Daher, it was very important to receive a complete patient history at the time of admission in order to provide proper treatment to the patient. She opined that, if the victim had been taken immediately to the hospital following his injuries, the staff could have reduced the pain suffered by the victim. Dr. Aher explained that the victim would likely suffer from lifelong disability and would be prone to seizures and epilepsy. There was a "fairly high likelihood" that the victim's "cognition and IQ and learning ability" were impacted by the bleeding in the brain and that his ability to reason could have been affected.

Dr. Marianne Neal, testifying as an expert in the field of pediatric radiology, determined that the victim suffered severe brain injuries—nine on a scale of one to ten. She described that the victim suffered bleeding of the brain and "brain cell death" from blunt force trauma. She stated that, within a reasonable degree of medical certainty, the victim would have suffered less extreme pain if brought to the hospital immediately after his injuries. According to Dr. Neal, the victim's injuries also would have been less severe if

treated immediately—immediate treatment would have resulted in less impairment to the victim's bodily and mental faculties. Dr. Neal opined that the victim had a possibility of mental delay and mental retardation due to his injuries and that the victim may suffer from seizures for the rest of his life.

Although their testimonies differed to some degree, the doctors stated that the victim's injuries occurred from one to two hits to the head. Both the Defendant's and the victim's mother's parental rights had been terminated prior to trial, and the victim had been placed in foster care. The victim's foster care mother also testified, and she relayed the developmental and physical difficulties the child suffered from following his injuries.

Based upon the foregoing, the jury found the Defendant guilty as charged. The trial court sentenced the Defendant to consecutive terms of twenty-five years. This appeal followed.

## ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court erred in denying his motion to suppress his statements to the police; (2) whether he was entitled to disclosure of grand jury materials; (3) whether reenactment photographs were properly admitted into evidence; (4) whether the trial court should have permitted individual voir dire of the potential jurors; (5) whether the trial court properly limited his cross-examination of the victim's mother and Det. Adkins; (6) whether the trial court erred by not allowing the Defendant's investigator to testify as a lay witness about the Defendant's susceptibility to suggestion and the investigation techniques used; (7) whether the trial court should have permitted him to present evidence from his mental evaluation about his reading comprehension difficulties; and (8) whether the trial court made several erroneous sentencing determinations, including the denial of his right to allocution, the length of the sentences imposed, and the imposition of consecutive sentencing.[1] We address each in turn.

### I. Suppression of Statements

First, the Defendant makes several challenges to the admission of his statements. Specifically, he argues that the statements were custodial in nature and that, at no time, was he advised of his Miranda rights. He also argues that the statements were not admissible under rules of relevance. Finally, he contends that the trial court erred in denying his motion to reconsider his suppression motion based on newly discovered evidence. The State responds that the trial court did not err in admitting the Defendant's statements to the police.

---

[1] For the purpose of clarity, we have reordered and renumbered the issues as presented by the Defendant in his brief.

*A. Voluntariness and Miranda Waiver*

The Defendant claims that his statements were involuntary because he did not knowingly and intelligently waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant concludes, "the 3rd and 4th statements made by the Defendant were made while he was effectively in custody and because he made those statements without the benefit of Miranda warnings those statements and confessions should have been suppressed." He notes several factors as to why his statements were not voluntarily given: (1) that he was instructed to come to the criminal justice center for an interview and was placed in a small room with his back to the door; (2) that it takes only a few minutes to read Miranda rights to a person; (3) that, after the third statement, where he made incriminating admissions, he still was not given Miranda warnings; and (4) that all four statements were not written by the Defendant, and Det. Adkins stated that she knew the Defendant possibly had reading difficulties, but still, she did not ask about his educational background or ability to understand what he was signing.

At the motion to suppress hearing, the State first called Det. Ide to testify about the Defendant's first statement at the hospital. He stated that on June 9, 2008, he received a call about possible child abuse and went to the hospital where he interviewed the Defendant and the victim's mother. Det. Ide identified himself as a law enforcement officer, and the Defendant agreed to speak with him. According to Det. Ide, the Defendant voluntarily accompanied him to a nearby hospital room, where he was alone with the Defendant for the interview. Det. Ide stated that the Defendant was not under arrest at this time, that he never brandished a weapon, and that he did not threaten the Defendant at any time.

Det. Ide wrote out a statement based upon his conversation with the Defendant. Det. Ide explained, "[I]t[']s easier just to write what they tell me and then at the end of that statement I will have them read the statement and then sign the statement verifying that that's what they have conveyed to me." Once the statement was complete, he had the Defendant read it and initial each page "from the beginning where [he] started reading to the end of that page where [he] stop[ped] reading[.]" Det. Ide admitted that he did not ask the Defendant if he could read or write; however, the Defendant indicated that he had read the statement and also signed it on the last page of the document. According to Det. Ide, the Defendant acknowledged that this was his statement and did not request to change anything therein. Det. Ide also testified that the Defndant did not appear to be under the influence of any substances at the time he gave the statement; Det. Ide opined that the statement was voluntary.

According to Det. Ide, the interview lasted about forty-one minutes; however, the exhibit showed it took only about twenty-one minutes. Det. Ide stated that he did not issue Miranda warnings because this was an "initial interview" and the Defendant was not a suspect at that time. When the interview was finished, the Defendant left.

-6-

Det. Adkins testified that she was called to follow-up and complete the investigation after Det. Ide's initial interview. As her first order of business, she spoke with the treating physician "to try to get some ideas as to what the nature of the injuries were and what they believed may have caused the injuries." She was informed that "[t]he child had two skull fractures, some bruising to the face and brain bleed[ing] believed to be from blunt force." The doctor told her that this "was non-accidental trauma[.]"

On June 10, at Det. Adkins' request, the Defendant and the victim's mother came to the Kingsport Justice Center to be interviewed. She did not arrange their travel; they arrived on their own. Det. Adkins first spoke with the victim's mother, followed by an interview with the Defendant. Det. Adkins was alone with the Defendant for the interview. According to Det. Adkins, the Defendant indicated a willingness to cooperate, and she did not read him his Miranda rights at that time. She told the Defendant that she wanted to discuss the following: "As far as the nature of the injuries and how they occurred and of course at that point in time my primary interest was trying to determine some timelines as to who had been with the child." She described the Defendant as "very cooperative" and stated that she never used force or coercion to get him to speak with her. She also opined that the Defendant did not appear intoxicated or under the influence of drugs or alcohol.

Det. Adkins prepared a written statement from this interview; she wrote as the Defendant talked. She said that this interview lasted "a couple of hours, maybe." Once finished, she read the statement to the Defendant, and he agreed that it was accurate. He did not make any changes and "voluntarily" signed the document. The Defendant was not under arrest, and he left after giving the statement.

Det. Adkins took a second statement from the Defendant the following day also at the Kingsport Justice Center under similar circumstances. She stated that she followed "the same process" she "outlined on the day before, the same method of taking his statement[.]" She confirmed that she again read the statement to the Defendant, and he signed it. He initialed his changes to the document.[2] He again left.

Det. Adkins testified that she took a final statement from the Defendant on June 12 again employing a similar method. She spoke with him personally that day, locating him at a local blood bank, and asked him to come to the justice center. He told her that he had an errand to run and would be there after that was completed. He showed up later that day and gave a statement. In this statement, the Defendant also made changes to the statement as written by Det. Adkins and initialed those changes. During this interview, Det. Adkins took

---

[2]  She testified at the suppression hearing that the Defendant did not make any changes to this second statement. However, it is clear from our review of the document and Det. Adkins' trial testimony that the Defendant did in fact make changes to this statement.

photographs of the Defendant demonstrating how he had inflicted the victim's injuries. He again left following this final interview; he was not arrested until a later date.

He was never issued any Miranda rights during any of these interviews. Det. Adkins explained that she continued to interview the Defendant as new information developed.

On cross-examination, Det. Adkins described the interview room as a five-by-seven-foot room. It did not have windows; the door was not locked during the interviews. The Defendant sat with his back to the door, and she sat across the table from him.

When asked if she ever confronted the Defendant with her "suspicion of his guilt" during the third interview, she replied, "At that time I did not because I had not had the opportunity to go back with the doctors with what he had told me had occurred." She explained that "the first time he said he had done something his statements were not corroborated by the evidence." After the third statement, she "had a little bit more information as to kind of what [she] was looking for but [she] had not been able to go back and talk with the doctors again to see what he had told me . . . ." Stated another way, before arresting the Defendant, she wanted to corroborate his statement with the medical evidence. She testified that she conducted multiple interviews with various individuals following the victim's admission to the hospital.

Det. Adkins was asked about her knowledge of the Defendant's reading abilities. She stated that she "had heard . . . somewhere" that he could not read, but she was unsure if that was before or after her interviews with him. She did not believe she asked the Defendant about his educational background or whether he could read. She explained that she reads her statements to the suspects to "err on the side of caution" in case someone is uneducated or unable to read. She stated that she "had no reason" to read the Defendant his Miranda warnings because he was not in custody.

The Defendant testified at the suppression hearing. He gave a different account of the events than the detectives, claiming the following: that he asked both detectives for an attorney; that Det. Adkins followed him to the justice center on all three occasions, and on the final occasion, initially activated her blue lights; that he informed Det. Adkins that he did not want to speak with her; that she sat between him and the door in the interview room; and that she made accusations about his guilt during the interviews.

The Defendant then detailed his experience with the criminal justice system, including prior unrelated interviews with the police. He confirmed that he did graduate from high school, receiving a "specialized" diploma. When asked if had "filled out questionnaires and indigency forms before" in court, he claimed that people had helped him fill out these documents because he "ain't that good with the reading or writing." He then stated that he

could read and write "some, . . . not a lot[.]" The Defendant confirmed that his initials appeared on one of the statements, but he claimed he did not ask Det. Adkins to change anything on the statement.

Det. Adkins was called in rebuttal. She denied meeting the Defendant in the hospital parking lot as he claimed and denied that she ever followed him to the justice center. She also testified that, as a detective, she did not drive a patrol car; she "was assigned a plain Chevrolet green, no light."

Turning to the issue presented by the Defendant, the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

A police officer is required to warn a suspect of his Miranda rights prior to a custodial interrogation. See Miranda, 384 U.S. at 478-79; State v. Riels, 216 S.W.3d 737, 754 (Tenn. 2007). The Tennessee Supreme Court has stated, "The warnings and waiver mandated by Miranda 'are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant' during custodial interrogation, whether inculpatory or exculpatory." State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (quoting Miranda, 384 U.S. at 476). Any waiver of Miranda rights must be "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. A court must look to the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citing Oregon v. Elstad, 470 U.S. 298, 318 (1985); State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980)), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 306 (Tenn. 2002).

The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. The Tennessee Supreme Court has concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)).

Initially, we quickly dispose of the Defendant's argument that these statements are involuntary because it would have been easy for Det. Adkins to give the Defendant Miranda warnings. Regardless of whether "it does not take long nor is it hard to give the Miranda warning to a suspect" as the Defendant asserts, such is not the test. The Miranda decision, by its own terms, only "applies to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in any significant way." State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting Miranda, 384 U.S. at 478) (internal quotation marks omitted).

The test for determining whether a person is in custody to a degree that he would be entitled to Miranda warnings is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). The determination of whether a suspect is in custody for Miranda purposes is a "very fact specific inquiry." Id. To that end, our supreme court has supplied the following, nonexclusive, list of factors "relevant to that objective assessment":

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer' suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id.

At the conclusion of the motion to suppress hearing, the trial court determined that the Defendant was not in custody for purposes of Miranda. In so concluding, the trial court made extensive findings of fact and conclusions of law. The trial court first noted that the Defendant was familiar with the criminal justice system, having prior felony convictions and serving time in jail. The trial court then specifically credited the testimony of Dets. Ide and Adkins "with regard to the fact that they were conducting an investigation about the alleged injuries of this child." The court continued:

He was the father. They talked with other individuals as well and that in each occasion there was nothing about the way that they spoke with him, either at the hospital or the three different times at the Kingsport Police Department that would cause a reasonable person in a suspect position to believe that they were ---- had this freedom of moving denied them just like a formal arrest. In each of those cases the [D]efendant went to the location of the police department on his own locomotion so to speak. I mean he either went in a vehicle or somebody else's vehicle. Every time he went from outside of the building ---- inside the building into the interview room with the officer there was nothing to indicate that he was ever in handcuffs or that he was ever ---- that the officer ever held on to him to go in, that he was ever searched or patted, any of those kinds of things that would seem to be associated with a formal arrest and every time after the interview took place and after the statement was read to him at least by Detective Adkins in all three of her cases and after he signed it he left. I mean he wasn't fingerprinted in any of those kinds of cases and there was obviously apparently in one case they took his picture. Apparently he was showing ---- they took his picture but in every time he left. I mean there was nothing to indicate the kinds of things that I think a reasonable person would associate with being arrested and therefore being in custody. . . . There's not anything that I've heard to cause me to feel like that he was forced or coerced in any way into making these statements.

On appeal, the Defendant seems to only be challenging the admission of his second and third statements to Det. Adkins. Regardless of which statements he is actually challenging on appeal, we conclude that the trial court properly denied his motion to suppress his statements because he was not in custody for purposes of Miranda. Det. Ide conducted an "initial interview" of the Defendant at the hospital following a report of possible child abuse. Det. Ide opined that the Defendant was not coerced and that the statement was voluntary. The Defendant left following that interview. Det. Adkins interviewed the Defendant in an interview room at the Kingsport Justice Center on all three occasions; no other officer was present during the meetings. While the door was shut, it was not locked.

The Defendant sat with his back to the door, and Det. Adkins sat across the table from him. The Defendant left after all three interviews. As noted by the trial court, the Defendant came to those meetings on his own volition, and the Defendant evinced a willingness to cooperate. According to the detectives, the Defendant was never confronted with suspicions of guilt or evidence of guilt during those interviews; Det. Adkins stated that she was trying to establish a timeline for the victim's injuries and wanted to verify information provided by the doctors during her interviews with the Defendant. After his final interview, she wanted to verify his version of the events with the medical evidence before arresting the Defendant. The Defendant signed each statement and initialed any changes. The trial court considered the relevant factors in making its determination that the Defendant was not in custody at the time he made the statements, and the evidence does not preponderate against those findings.

## 2. Relevancy

The Defendant also argues that his statements were not admissible relying on rules of relevance. Specifically, he contends, "The four (4) statements contradict one another and do not tend to correlate or corroborate one another," and therefore, "[t]he probative value of such contradictory evidence was unquestionably outweighed by [the] danger of unfair prejudice, confusion of the issues, or misleading of the jury." In a separate section of his brief, he makes a similar argument, stating that the trial court "ruled that the existence of multiple statements only enhances the probative value." He continues, "[E]ach and every statement is individual in its nature and facts and circumstances of each should be examined separately." He concludes that the trial court's decision was incorrect and that the statements should have been suppressed under Tennessee Rule of Evidence 403. The State responds that the trial court properly determined that each of the Defendant's statements put the others into context.

At the pre-trial hearing, defense counsel argued that admission of all four statements would serve only to confuse the jury and invoke an emotional response. The prosecutor responded that admission of the four statements showed "a progression of admissions and it[']s what the [D]efendant said and it goes to the [D]efendant's intent and his purpose and to the circumstances which these injuries occurred so we say it's material and relevant and that outweighs any emotional response by a jury[.]" He continued that the jury would be instructed to base their decision on law rather than with any sympathy. The prosecutor also noted that he had the burden to prove the Defendant's guilt beyond a reasonable doubt. Defense counsel replied that the probative value of the contradictory evidence was not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

In rendering its decision, the trial court first noted that it had already determined that the Defendant's statements were voluntary at the motion to suppress hearing. Regarding the Defendant's relevance objection, the trial court ruled, "I think the fact that there are multiple statements as opposed to one statement frankly puts each of those statements in context of

-12-

the other and I think that it's important that the jury hear that context . . . . I do find that it has probative value and I do not find that that probative value is substantially . . . outweighed by the danger of unfair prejudice." The trial court also noted that the admission of multiple statements "can work both ways[,]" i.e., benefitting either party.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

As the trial court noted, it had previously determined that all four statements were voluntary, considering separately the admissibility of each of the four statements on constitutional grounds. As for any relevancy objection to admission of all four statements, we agree with the trial court that each of these statements helped place the others into context. The Defendant's multiple admissions further established his culpability for these crimes; the Defendant continued to change his story as the evidence developed. We cannot say that the trial court abused its discretion in determining that the probative value of this evidence substantially outweighed the danger of unfair prejudice, confusion of the issues, or misleading the jury.

*3. Motion to Reconsider*

The Defendant submits that the trial court erred in denying his motion to reconsider its prior ruling on his motion to suppress his statements. On appeal, he provides, "The essence of the Defendant's argument is that pursuant to newly discovered evidence the statements and confessions of the Defendant should have been suppressed." Specifically, a mental evaluation was performed on the Defendant to determine his competency to stand trial. Based upon the evaluation, the doctors concluded that the Defendant was competent but noted that the Defendant suffered from "reading comprehension difficulties." This finding was noted in a letter to the court.

At the pre-trial hearing, defense counsel requested the trial court to reconsider its previous ruling "based on the new evidence as to his psychological evaluation[.]" Defense

counsel continued, this coupled with the fact that the Defendant received a "special ed diploma[,]" "he might not have known what he was signing, understood what he was signing or even understood if it was read to him." The State argued that the Defendant's reading comprehension was "immaterial" because Det. Adkins read the Defendant's statements to him. The trial court then noted that the Defendant had also sent the court "a lot of correspondence, too." Defense counsel replied that the Defendant was being helped by his fellow inmates in drafting those materials. The trial court noted that the Defendant did have some education and that the letter only referenced "potential" reading difficulties. The court denied his request to reconsider its previous ruling on suppression of the Defendant's statements, finding that, even if the Defendant did have potential reading comprehension difficulties, that fact by itself did not rise "to the level that the statements should be suppressed."

The Defendant's communication skills appeared adequate; the extent of his "reading comprehension difficulties" was never explained. The Defendant never indicated to either of the officers that he could not read. Also, the Defendant's level of reading comprehension was addressed at the motion to suppress hearing. Det. Ide said that he had no knowledge that the Defendant could not read or write. When Det. Ide handed the Defendant his statement to read, the Defendant indicated that he had read the document before he signed it. Det. Ide also testified that he asked the Defendant "to sign it from the point where he stopped reading at which point he signed, initialed the first page and the second page." Det. Adkins was asked if she knew whether the Defendant could read, and she said that she "had heard that at somewhere in time" but was "not really sure if it was during those interviews or later on in time." She stated that in order to err on the side of caution, it was her customary practice to read her statements to the defendants before they signed them.

The issuance of this letter following the mental evaluation did little to improve the Defendant's argument for suppression of his statements. We agree with the trial court that, even if the Defendant did in fact have reading comprehension difficulties, such fact by itself does not render all four of his statements inadmissible. See, e.g., State v. Sheridan Armstrong, No. W2003-02100-CCA-R3CD, 2004 WL 2378253, at *5 (Tenn. Crim. App. Oct. 20, 2004) (holding that, although mental health experts concluded that the defendant was mildly mentally retarded, his confession was still voluntarily made). The Defendant's reading level is just one factor to consider when making a determination if his statements were voluntary; people who cannot read at all can still make voluntary statements to law enforcement. Moreover, Det. Adkins testified that she read all of the Defendant's statements to him before he signed them. We cannot say that the trial court erred in denying the Defendant's request to reconsider his suppression motion.

*II. Grand Jury Materials*

-14-

The Defendant argues that the trial court erred in denying his motion for disclosure of grand jury materials pursuant to Tennessee Rule of Criminal Procedure 6(k). Prior to trial, the Defendant filed a motion for disclosure of "information and materials relating to the conduct of the grand jury in this cause," arguing that discovery of these materials was necessary in order for him "to adequately prepare his defense, including possible motions to dismiss the indictment." In the motion, the Defendant requested the following materials: (1) the concurrence slips for the grand jury and all logs, minutes, voting records, or memoranda with respect to the presentment returned against the Defendant; (2) the name, address, occupation, and date of appearance for all witnesses examined and stenographers or operators of a recording device present before the grand jury; (3) all logs, minutes, memoranda, or transcripts showing any advice or legal instruction given to the grand jury by the State or the court concerning the offenses charged, and all comments by the State or any grand juror on the evidence presented and the testimony of any witness, the guilt of the Defendant, the decision of any person to plead guilty to criminal charges, or in response to any questions posed by a grand juror; (4) all information, including documents, dealing with attempts by the State to reach a plea bargain with either of the prospective defendants; and (5) all draft indictments prepared by the State.

At the pre-trial motion hearing, defense counsel repeated his request for disclosure of grand jury materials as important for preparation of the defense. In response to the Defendant's request, the trial court referred to the presentment, noting that Det. Adkins was the only witness to testify before the grand jury. Defense counsel stated, "Of course if she has testified somehow differently, . . . we could use that for impeachment[.]" The trial court stated that, because grand jury proceedings were not recorded, there was no transcript or minutes to obtain. Defense counsel replied that was the reason he was requesting "materials they have . . . prepared, . . . that might not be attorney materials but materials that [were] presented to the grand jury in getting this indictment." The trial court then noted that "any evidence" presented to the grand jury, such as pictures or diagrams, would likewise have been included in regular discovery materials.

The prosecutor confirmed that Det. Adkins was the only witness before the grand jury and that there was no recording of that proceeding. The prosecutor stated that he was present when Det. Adkins testified and that "she basically did as normally in a grand jury proceeding, she summarized and testified under oath as to the evidence in possession[.]" According to the prosecutor, "most of" the evidence presented at the hearing, "if not all, [was] provided pursuant to discovery." Defense counsel responded, "And we, of course, are also asking for draft indictments that had presented in preparing (inaudible)." After further explanation by the trial court regarding the operation of grand jury proceedings, defense counsel inquired, "[I]f the [c]ourt would rule that if there is any material that becomes available, as the prosecutor has said, the Generals would make it available to us. That's all we would ask for.

And while I understand that the General just said there was nothing but . . . maybe there was."

The trial court denied the Defendant's motion, ruling that, while it appreciated the "seriousness of this charge" against the Defendant, "that in and of itself" did not "change[] the rules of criminal procedure in the grand jury[.]" The court then informed defense counsel that the State would likely provide him with an opportunity to review witnesses' statements prior to trial and, moreover, the State had a "responsibility to present any exculpatory evidence that they either know of now or may know of at a later date." For those reasons, the court refused to "issue a particular order . . . other than just [the State] complying with the responsibilities that they already have that exist under law."

On appeal, the Defendant relies on the exception to the rule of secrecy of grand jury testimony found in Tennessee Rule of Criminal Procedure 6(k) to argue that the trial court should have ordered the State to disclose the "materials" of the grand jury. Specifically, the Defendant requests the "ministerial records of the grand jury described in his motion" and any "draft indictments prepared by the prosecution." The Defendant infers that the trial court should have inquired of the State whether any "materials" were presented to the grand jury before denying the Defendant's motion.

Tennessee grand juries do not normally record the testimony of witnesses. See Tenn. R. Crim. P. 16, Advisory Comm'n Cmts.; see also Tenn. Code Ann. § 40-12-208 (requiring certain special investigative grand juries to record their proceedings). There is no requirement to do so. See Parton v. State, 455 S.W.2d 645, 647 (1970). However, the grand jury itself, but not the district attorney, may record the testimony of witnesses so long as the requirement of secrecy is maintained. See Tiller v. State, 600 S.W.2d 709, 712 (Tenn. 1980) (indicating that it is proper for the grand jury "to record or have recorded the testimony of witnesses appearing before that body").

A defendant is entitled to discovery of his testimony (and that of co-defendants being tried jointly) before the grand jury. Tenn. R. Crim. P. 16(a)(1)(A), (B), (C), and (a)(3). Other than discovery of a defendant's own testimony and that of co-defendants, there is no general right to discovery of grand jury testimony. Under limited circumstances, a trial judge has authority to permit discovery of grand jury testimony. Rule 6(k)(2) provides for the following exception to the rule of secrecy: (1) upon an allegation of perjury; or (2) upon an investigation by the court of inconsistency of testimony, the grand jurors are required to disclose the testimony of witnesses. The latter circumstances involves the requirement of a clear showing that the removal of the oath of secrecy is necessary to the "attainment of truth and justice." West v. State, 466 S.W.2d 524, 525 (1971) ("There is no provision in our law for the blanket discovery of Grand Jury testimony."). Consequently, the party seeking disclosure must have some specific reason suggesting inconsistent testimony.

The Defendant has failed to show any error committed by the trial court. As noted by the trial court, the only witness to testify before the grand jury was Det. Adkins. The Defendant merely asked for "ministerial records" of the grand jury and any "draft indictments"; there were no actual allegations of inconsistencies in the grand jury testimony. Rule 6(k) does not require that all grand jury "materials" be turned over to the defense; the rule requires only the disclosure of witness's testimony for the purpose of ascertaining the consistency of the witness's testimony or to disclose the grand jury testimony of any witness charged with perjury. See State v. Reid, 164 S.W.3d 286, 331 (Tenn. 2005). Moreover, the proceedings in this case were not recorded, so the State cannot produce documents it does not possess. Id. This issue is without merit.

### III. Reenactment Photographs

The Defendant, relying on rules of relevance, contends that the trial court erred by allowing the State to introduce into evidence two reenactment photographs demonstrating how he inflicted the injuries on the victim. The State argues that the photographs were relevant to show how the victim suffered his injuries, showing how the Defendant intentionally picked up the victim from the carseat and swung the victim's head into a wall. The State further counters that the probative value of the photographs substantially outweighed any risk of unfair prejudice. We conclude that the trial court properly admitted the photographs into evidence.

During the Defendant's fourth statement, he was asked to demonstrate for Det. Adkins how he inflicted the victim's injuries using a carseat and an Elmo doll. The Defendant's actions using a demo carseat and Elmo doll were photographed, and the State sought to introduce these photographs at trial. The Defendant objected, arguing first that the photographs were irrelevant because they were not "pictures of the true event," and alternatively, that they were overly prejudicial. The State countered that the photographs were "highly relevant" because it was the Defendant himself demonstrating what he did that led to these injuries "which [was] essential to this case, to the cause and the consequences of the injuries and how the injuries occurred and who did it." The State also noted that the pictures clearly showed an intentional act, rather than an accidental injury. The trial court ruled the photographs were relevant and admissible as a "demonstration of the [D]efendant as to what he did with the child" and concluded that the probative value was not outweighed by the danger of unfair prejudice. The trial court further explained that, because the Defendant was using a red and green doll, it was clear to the jury that the object was "a doll not a child or a doll made to look exactly like a child[.]" Det. Adkins testified about the reenactment at trial, and the photographs were admitted into evidence over the Defendant's objection.

The Defendant contends that the trial court erred by admitting the photographs into evidence because they do not depict a true and accurate portrayal of how the victim suffered

his injuries. Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. Banks, 564 S.W.2d at 949 (citations omitted). Accordingly, "the admissibility of photographs lies with the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005) (quoting Banks, 564 S.W.2d at 949).

In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Again, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A relevant photograph is generally admissible, Tennessee Rule of Evidence 402, unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

In State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984), this court stated that an in-court reenactment may be admissible, especially when the defendant has the opportunity, as the Defendant did in this case, to cross-examine the witnesses who conducted the demonstration. Furthermore,

Evidence may be given of experiments, demonstrations, and tests made out of court and not in the presence of the jury upon the same principles which permit them to be conducted in the jury's presence. It is a matter peculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances. The test for exclusion is whether the [demonstration] would confuse rather than aid the jury.

State v. Robertson, 130 S.W.3d 842, 855 (Tenn. Crim. App. 2003).

Det. Adkins testified that she asked the Defendant to show her "exactly how he picked [the victim] up and exactly how he hit his head into the wall." The Defendant was aware he was being photographed as he demonstrated his actions using an Elmo doll, and he went so far as to tell Det. Adkins exactly how far to place the carseat away from the wall for the demonstration. Det. Adkins opined to the jury that the pictures accurately depicted what the Defendant said he did to the victim. In our view, the reenactment and resulting photographs were relevant to show the Defendant's intent in banging the victim's head against a wall and that the injuries were non-accidental. As noted by the trial court, a toy rather than a lifelike

-18-

baby doll was used as a demonstrative aid in the reenactment, thereby minimizing the danger of unfair prejudice to the Defendant. Moreover, the reenactment and photographs aided the jury. Therefore, the trial court did not abuse its discretion by admitting the two photographs into evidence. See, e.g., State v. Travis Kinte Echols, No. E2009-01697-CCA-R3-CD, 2011 WL 2418737, at *21-22 (Tenn. Crim. App. June 14, 2011), perm. app. denied, (Tenn. Oct. 21, 2011) (reenactment photographs showing the victim's and defendant's positions at time of shooting were properly admitted).

*IV. Voir Dire*

Next, the Defendant contends that the trial court erred by denying his motion for individual voir dire of prospective jurors. Specifically, he asserts that, "[w]hile here there were no serious or religious undertones, the nature of the crime was so egregious . . . , wherein the victim was only 9 days old at the time of the injury, that the individual or partially individual voir dire was more than warranted." In response, the State first contends that the Defendant has waived the issue for failing to compile a complete record on appeal, and alternatively, that the trial court acted within its discretion in conducting voir dire.

The Defendant filed a pre-trial motion requesting individual voir dire based solely on the nature of the crime. At the motion hearing which followed, the trial court noted its customary practice was to ask members of the venire if they knew of or recognized the Defendant or had read or heard anything about the particular case. The trial court continued that, if a potential juror responded in the affirmative, then the trial court would talk with that person "individually about what they might have read or heard[.]" Defense counsel then requested "partial individual voir dire should the need arise[.]" The trial court stated that it was unaware of any pre-trial publicity in this case, to which defense counsel stated that he was "trying to do it out of an abundance of caution" because there was "a child involved." The trial court stated that it was not inclined to grant individual voir dire solely on the circumstances of the crime "without some additional showing" from the venire of knowledge of the Defendant or the crime. The trial court concluded, "Okay, so I will agree to partial on individual voir dire." Defense counsel replied, "That's all I ask." Thereafter, the Defendant has failed to include a transcript of the voir dire in the appellate record; therefore, we do not know if any prospective jurors knew the Defendant or had read, seen, or heard anything about the case, necessitating the need for individual voir dire in accordance with the trial court's order.

"The ultimate goal of voir dire is to [ensure] that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). "The prevailing practice is to examine jurors collectively." State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002); State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); State v. Hopper, 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). However, "[i]ndividual voir dire

-19-

is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Austin, 87 S.W.3d at 471-72 (quoting Howell, 868 S.W.2d at 247).

At the pre-trial hearing, the trial court ruled that defense counsel would have to address questions to the entire jury pool regarding their knowledge of the Defendant and the case. Also, the trial court was not aware of any pre-trial publicity in the case. The trial court stated that defense counsel would be permitted to conduct individual voir dire of any jurors who expressed knowledge of the Defendant or the case. The Defendant has not shown that the trial court abused its discretion in requiring him to address questions to the entire jury before permitting individual voir dire of jurors who expressed knowledge about the Defendant or the case. See, e.g., State v. Gary Lynn Harvey, No. E2008-01081-CCA-R3-CD, 2010 WL 5550655, at *39 (Tenn. Crim. App. Dec. 30, 2010) (trial court's ruling permitting individual voir dire only of jurors who expressed knowledge and opinions of lawsuits involving the Sheriff's Department was proper). Additionally, the Defendant has not included a transcript of the voir dire in the appellate record, thus offering no proof that he suffered any prejudice as a result of the trial court's ruling. Moreover, at the motion for new trial hearing, the trial court could not recall any specific instance where defense counsel requested individual voir dire. The Defendant is not entitled to relief on this issue.

### V. Limits on Cross-Examination

The Defendant contends that the trial court improperly precluded him from fully cross-examining two witnesses. He contends that he should have been allowed to cross-examine the victim's mother for bias based on Department of Children Services' ("DCS") parental rights termination proceedings. He also asserts that he should have been allowed to ask Det. Adkins (1) if she believed that the Defendant was covering for someone during his statements and (2) about two reprimands in her personnel file. The State contends that the trial court did not unduly restrict the cross-examination of these witnesses.[3] We address the Defendant's argument to each witness in turn.

### A. Victim's Mother

Prior to cross-examination of the victim's mother, the court conducted a jury-out hearing because the Defendant had expressed a desire to cross-examine the victim's mother

---

[3] In making his various arguments, the Defendant relies on documents included in a "Joint Appendix." The documents included therein are a transcript of the dependency and neglect hearing in juvenile court and two documents from Det. Adkins' personnel file at the Kingsport Police Department. However, the Defendant never sought to have the documents introduced at trial; the trial court did not rely on the documents in making its decision; the documents are not certified; and the Defendant has not attempted to properly supplement the record with these documents. Accordingly, we agree with the State that these documents are not properly before this court.

about DCS dependency and neglect proceedings and the subsequent termination of her parental rights. The prosecutor relayed the following facts from those DCS proceedings. DCS had filed an action against both the Defendant and the victim's mother for severe abuse and neglect. At the hearing in juvenile court, the victim's mother admitted to severe child neglect, and the abuse charge against her was dropped. The court found that the Defendant had committed both severe abuse and neglect.

Then, returning to the case herein, the prosecutor objected to any questioning about the dismissal of the child abuse allegation against the victim's mother because the juvenile hearing involved "a completely different standard of proof[.]" The prosecutor continued that defense counsel was permitted to ask if "any promises [were] made in exchange for her testimony" against the Defendant at trial "but to couch it in terms of DCS made some dismissal of some dependent neglect allegations or severe child abuse" was not appropriate for cross-examination. The prosecutor then noted that defense counsel also expressed a desire to ask the victim's mother about her voluntary surrender of her parental rights based upon her stipulation that she was unable to provide for the victim's care. Defense counsel stated that the State had "opened the door" on direct when the victim's mother responded to questioning that she had "signed away her rights" in the parental rights termination proceeding. Defense counsel averred, "I can now cross-examine her as to that and ask her why she did it and was there any promises made to her in exchange of her dropping her parental rights and there be nothing filed against her." Defense counsel noted that, after the victim's mother stipulated to the finding of neglect, "everybody [was] pointing fingers" at the Defendant. According to defense counsel, he wanted to inquire about these actions to explore any possible bias on the part of the victim's mother. The prosecutor then stated that "what DCS does isn't relevant to the State[,]" as they were not a party to the dependency neglect action, a civil proceeding, and she had nonetheless agreed to the termination of her rights.

The court allowed the defense to ask the victim's mother if she had received any promises from the district attorney's office, not DCS, in exchange for her trial testimony against the Defendant. However, the trial court precluded the defense from asking about the DCS proceedings, reasoning that it could not "see in any way how that had any bias at all with regard to her testimony here today," particularly because the victim's mother had "already given . . . up" her parental rights. Later, the victim's mother was recalled, and she testified that the district attorney's office never promised her immunity or any other benefit in exchange for her trial testimony against the Defendant.

The Defendant cites Tennessee Rule of Evidence 616, which permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The right to question a witness as to potential bias is a recognized fundamental right. Delaware v. Van Arsdall, 475 U.S. 673, 680

(1986); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). "Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and [a]rticle 1, [s]ection 9 of the Tennessee Constitution." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (citations omitted). To prevail, the Defendant must establish that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." Van Arsdall, 475 U.S. at 680; see also Rice, 184 S.W.3d at 670.

While it is true that the Defendant is entitled to confront witnesses regarding the potential bias of those witnesses, such testimony however must still be relevant. The trial court's ruling herein was simply one of relevance, i.e., evidence concerning the DCS proceedings was not relevant to show any possible bias of the victim's mother. We cannot say that the trial court abused its discretion in this regard. The victim's mother's rights had been terminated by DCS prior to her testimony at trial against the Defendant. The question of why the victim's mother agreed to a finding of neglect during the DCS proceedings has no bearing on whether she was biased in favor of the prosecution. Regardless of whether her parental rights were ultimately terminated based upon a finding of abuse or a stipulation of failure to provide care, there was simply no proof that the victim's mother had anything to gain with DCS by her testimony against the Defendant. Moreover, the district attorney's office was not involved in the juvenile court proceedings. The trial court properly allowed the Defendant to question the victim's mother about whether the district attorney's office had promised her anything in exchange for her testimony against the Defendant, to which she replied in the negative. The trial court did not improperly limit the Defendant's cross-examination of the victim's mother.

### B. Detective Adkins

The Defendant argues that the trial court erred when it limited his cross-examination of Det. Adkins in two instances: specifically, not being allowed (1) to ask of the detective if she believed the Defendant "was covering for somebody" nor (2) to ask about two separate reprimands in the detective's personnel file with the Kingsport Police Department. The State responds that the trial court did not abuse its discretion by disallowing the Defendant to cross-examine Det. Adkins on these subjects.

### 1. Covering for Someone

Defense counsel sought to ask Det. Adkins about her possible belief that the Defendant was lying to cover for someone. The exact question posed to Det. Adkins was as follows: "Did you have a reason to believe that what he was telling you if he was covering for somebody or ---" The prosecutor objected on grounds of speculation: "I object to what

she believed he was doing." Defense counsel argued that the question asked for the detective's thoughts about whether the Defendant was lying to cover for someone, not those of the Defendant. The trial court sustained the speculation objection and disallowed the question.

On appeal, the Defendant argues that this question asked for proper lay opinion testimony under Tennessee Rule of Evidence 701, reasoning that he was not asking Det. Adkins to speculate but that "[s]he could form a reasonable belief based on her investigation as to whether the Defendant was lying or not." Opinion testimony is not objectionable merely because it embraces an ultimate issue before the jury. Tenn. R. Evid. 704. However, opinion testimony by lay witnesses must meet the requirements of Tennessee Rule of Evidence 701, which provides that lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). However, the admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony. Blackburn v. Murphy, 737 S.W.2d 529, 533 (Tenn. 1987). Put another way, the lay witness may express an opinion to describe her observations if that is the only way in which she can effectively communicate her observations to the jury. State v. Brown, 836 S.W.2d 530, 550 (Tenn. 1992). When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion. See, e.g., State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

The question posed to Det. Adkins was seeking her opinion on the Defendant's truthfulness, or in this case her perceived untruthfulness, during the statements he made to her ultimately confessing to these crimes. The testimony sought to be elicited did involve the ultimate issue in this case, i.e., whether the Defendant was truthful when he confessed to committing the crimes of which he was accused. The question as posed to Det. Adkins was improper because it called for a conclusion of the witness and invaded the province of the jury to determine the veracity of witnesses' testimony. See, e.g., State v. James Arthur Johnson, No. M2009-01147-CCA-R3-CD, 2010 WL 3323796, at *4-5 (Tenn. Crim. App. Aug. 24, 2010) (trial court erred in admitting detective's opinion that defendant was a willing participant in crime). We agree that such is not proper opinion testimony. It was for the jury to decide if the Defendant was being truthful to Det. Adkins when he admitted to committing these crimes and thus guilty as charged. The trial court did not abuse its discretion in so limiting Det. Adkins' testimony.

*2. Reprimands*

Regarding Det. Adkins' reprimands, the Defendant sought to cross-examine her about two specific instances: one in 1996 where Det. Adkins was reprimanded for discharging her service weapon inside her home and another in 2002 where an assistant district attorney filed

a complaint about Det. Adkins not showing up when subpoenaed to court. Defense counsel asserted that he was offering the evidence under Rule 608, attacking Det. Adkins' character for truthfulness. The trial court noted that the 1996 incident was over ten years old, and therefore, under Rule 608(b) the probative value would have to substantially outweigh any prejudicial effect. The court found that it did not. With respect to the 2002 reprimand, which was not quite ten years old, defense counsel argued that it was probative of character for truthfulness because it was a "part of the job." The trial court found that the 2002 reprimand did not have "probative value for the purpose of truthfulness or untruthfulness." In so ruling, the trial court accepted that there was a reasonable factual basis to support both allegations.

Tennessee Rule of Evidence 608(b) provides,

Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness . . . .

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). The rule further provides,

The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs it prejudicial effect . . . .

Tenn. R. Evid. 608(b)(2). This court reviews a trial court's ruling pursuant to Rule 608(b) under an abuse of discretion standard. Reid, 91 S.W.3d at 303.

The Defendant's main complaint appears to be that the trial court did not hear any evidence on the two reprimands but ruled that they were inadmissible without explanation. The Defendant asserts that the evidence of Det. Adkins' reprimands "had overwhelming probative value": "It would have put her testimony as to the willfulness of the Defendant's statements as well as to the whole investigation into question in the eyes of the jury." We disagree.

In this case, the trial court complied with Rule 608, holding a jury-out hearing on the matter and making the appropriate findings. As previously noted, the trial court in issuing its ruling assumed that there was a reasonable factual basis to support the allegations. Regarding the 1996 reprimand for discharging her service weapon inside her home, the trial court properly focused on the time which had passed since Det. Adkins' conduct and the commencement of the prosecution against the Defendant, noting the enhanced standard which applied. This incident had little probative value of Det. Adkins' character for truthfulness. The trial court properly determined that the probative value of this reprimand did not substantially outweigh its unfair prejudicial effect upon the jury. We likewise agree with the trial court that the 2002 reprimand involving Det. Adkins' failure to appear in court for the district attorney's office was not probative of her truthfulness. See, e.g., United States v. Williams, 249 F. App'x. 482, 483 (8th Cir. Oct. 3, 2007) (holding that prosecution witness's failure to appear for court proceedings was not probative of his truthfulness under Federal Rule of Evidence 608(b), and even if such were the case, the trial court had the discretion to disallow the line of questioning). Therefore, we cannot say that the trial court abused its discretion by determining that the Defendant could not cross-examine Det. Adkins about the two reprimands.

## VI. Investigator Testimony

The Defendant argues that trial court erred when it did not allow his investigator to testify as a lay witness about the Defendant's susceptibility to suggestion and about the investigation techniques used. At a jury-out hearing, the defense counsel informed the court that he wished to call his investigator, Jason East, to testify that he found the Defendant "to be very suggestible and that the progression of the confessions, in his opinion, were such that it . . . led [the Defendant] to his confession[.]" The State objected that the witness was not qualified as an expert to provide "testimony in the form of an opinion about the [D]efendant's mental condition." The State further noted that the defense had not provided the proper notice as required by the Rules of Criminal Procedure for expert testimony. Defense counsel elaborated about the substance of the investigator's testimony: "What his opinion, what his testimony is going to be, Your Honor, as to his opinion and based on his experience of about 17 years doing this kind of work, you know, what kind ---- how the confessions progressed."

The trial court noted that it had already conducted a motion to suppress the statements, wherein it determined at that time that the statements were voluntarily made. The trial court explained that this was just another attempt "to revisit" the issue. The trial court noted three possible issues with presentation of the investigator's testimony—one, was he qualified as an expert; two, should this issue have been dealt with at the time of the motion to suppress; and three, "the issue of false confession has come up before." The trial court opined that there was no basis for the investigator's testimony but allowed the defense to make an offer

of proof. The defense called the investigator to testify "just to see if we can qualify him to testify."

Mr. East, a licensed private investigator, first provided his educational background, including a Bachelor's degree in psychology and sociology and Master's degree "in Interdisciplinary Studies that includes counseling, sociology, and criminology." His professional experience included work for private attorneys, as a case manager at DCS, and as an officer with the Johnson City Police Department. According to Mr. East, if he were permitted to testify on the Defendant's behalf, he would testify about the investigation techniques Det. Adkins used and his opinion on how "we arrived to the statements that [the Defendant] has made." He would further testify about the Defendant's susceptibility "to certain influences." Specifically, he would provide the jury with a "diagram or give somewhat of a diagram of how an investigation, including statements and how to lead up to a certain statement and what factors with the [D]efendant can influence on how you treat that particular case." Upon questioning by the court, Mr. East confirmed that his determinations about the investigation and the Defendant's susceptibility were based upon conversations with the Defendant.

The trial court then issued a definite ruling, concluding that Mr. East could not testify about the Defendant's susceptibility and the investigation techniques used because he did not qualify as an expert. The trial court reasoned as follows:

> I think he has to be qualified as an expert and I don't find, based on this that he has any special knowledge, skill or experience such that would put him in a position of being able to testify as to [the Defendant's] susceptibility in a confession and to why he may have given that. I mean the jury, with regard to investigative techniques, I mean the jury has heard from the two officers that received statements from [the Defendant] and in my opinion, I mean I think the jury is in a position to mak[e] the decision whether or not it[']s voluntary and whether or not that was his statement and whether or not it was suggestive or anything like that. So I don't even think investigative techniques really fit into an expert opinion area. I think that's really just more any lay person can have an opinion about that and make a determination as to whether or not it was based upon the evidence.

Defense counsel then noted that he had not moved to have Mr. East qualified as an expert but that Mr. East was testifying as an experienced lay person. The trial court noted that, any such testimony as a lay person would be based on hearsay:

> So, you know, then it would be based on hearsay and so he's giving an opinion based on hearsay and the only way I know that you can base it on

what, hearsay, would be either from [the Defendant] or perhaps from the officer that was present. You know, [Mr. East] wasn't there. I mean maybe if he were there maybe he might be able to give an opinion. But when it's based on hearsay and you're not qualifying him as an expert it's kind of hard for me to allow him to testify.

On appeal, the Defendant argues that Mr. East was not offered as an expert witness and that his testimony as a lay witness was admissible pursuant to Rule 701, Tennessee Rules of Evidence. As stated previously, unless qualified as experts, opinion testimony by lay witnesses must meet the requirements of Rule 701, which provides that lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." This court has held that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

The investigator's testimony in this case is not the proper substance for lay opinion testimony. Testimony about the connection between the Defendant's susceptibility to suggestion and the interrogation techniques employed by Det. Adkins is properly categorized as expert testimony because the opinion testimony is predicated upon specialized knowledge that is unfamiliar to most lay-persons and that should be offered as expert testimony, due to its complex nature. See State v. Ackerman, 397 S.W.3d 617, 631-32 (Tenn. Crim. App. 2012) (recognizing that expert testimony about a defendant's susceptibility to suggestion could be admissible); State v. Ted Ormand Pate, No. M2009-02321-CCA-R3-CD, 2011 WL 6935329, at *11-12 (Tenn. Crim. App. Nov. 22, 2011) (addressing the question of whether expert testimony regarding a defendant's susceptibility to making false confessions is necessary to substantially assist the trier of fact). Accordingly, we conclude that the trial court did not abuse its discretion by concluding that the investigator must be qualified as an expert before so testifying, and the Defendant does not challenge the trial court's determination of Mr. East's expert qualifications on appeal. Accordingly, this issue has no merit.

*VII. Mental Evaluation*

The Defendant contends that the trial court erred in not allowing him to present evidence from his mental evaluation. As previously discussed, a mental evaluation was performed on the Defendant to determine his competency to stand trial. Based upon the evaluation, the doctors concluded that the Defendant was competent but noted that the Defendant suffered from "reading comprehension difficulties." This finding was noted in a letter to the court, and defense counsel wanted to have it admitted into evidence. The prosecutor responded that the finding of reading comprehension difficulties in the letter was irrelevant because Det. Adkins testified that she read everything to the Defendant anyway. The prosecutor continued, although Mr. Ide stated that he had the Defendant read his statement, there was nothing inculpatory in that statement, and that admission of the letter would serve only to mislead and confuse the jury. Defense counsel replied, "A problem is a problem, okay, I think the jury has a right to know that [the Defendant] has a special ed education and that he has a reading comprehension problem. It does go to mental state maybe to some degree . . . ."

The trial court held that the letter itself was inadmissible and that there was no basis to cross-examine Det. Adkins with the contents of the letter. The trial court reasoned that it had previously determined that the Defendant's statements were voluntary and admissible and that admission of this letter would undermine that determination. The trial court noted that, if the Defendant elected to testify, he could certainly discuss his reading difficulties.

The Defendant again seems to point to Rule 701 as a basis for admission of this evidence, specifically arguing that "[t]he evaluation was prepared by a court appointed, State psychologist/[psychiatrist], and would have been rationally based on the perception of the witness that would help the jury in understanding the actions of the events or person perceived . . . ."[4] However, we agree with the State that the report is inadmissible hearsay. See Tenn. R. Evid. 802, 803. Moreover, at trial the Defendant was permitted to ask Det. Adkins if she was aware that the Defendant had difficulties reading, and she replied that she had no personal knowledge of such. Det. Ide was asked on direct if the Defendant read his statement before he signed it, and Det. Ide responded in the affirmative. Det. Ide was never asked on cross-examination if the Defendant appeared to have any difficulty reading that statement. We agree with the trial court that the defense had not made any argument to warrant either introduction of the letter or permit cross-examination of Det. Adkins about the contents of the letter. The trial court did not abuse its discretion when it did not allow the Defendant to introduce the mental evaluation.

*VIII. Sentencing*

---

[4] He does not cite to a specific rule of evidence but only the case of State v. Davidson, 121 S.W.3d 600 (Tenn. 2003). His pinpoint cite is to page 613, which deals with a wholly unrelated issue. On page 617, our supreme court deals with a similar issue addressing Rule 701.

-28-

The Defendant challenges several aspects of his sentence. Specifically, he contends that he was denied his right of allocution, that the trial court erred in enhancing his sentence to the maximum sentence within his range on each count, and that the imposition of consecutive sentencing was improper. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Bise, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

At the sentencing hearing, the presentence report was admitted as an exhibit without objection. At the time of the sentencing hearing, the Defendant was twenty-three years old, divorced, and had fathered two children, including the victim. The presentence report reflected that the Defendant had prior felony convictions for attempted aggravated robbery, aggravated assault, and burglary, and misdemeanors convictions for three counts of contributing to the delinquency of a minor and one count of use of a prohibited weapon. At the sentencing hearing, the trial court noted that, on February 9, 2008, the Defendant was released on bond for the aggravated robbery, aggravated assault, and burglary charges, and that the instant offenses occurred while he was released on that bond. A copy of the bond was introduced into evidence at the sentencing hearing. The presentence report prepared for the Defendant's sentencing on those three prior felony convictions was also admitted as an exhibit.

Moreover, the presentence report showed that the Defendant had previously been granted judicial diversion on the prohibited weapon offense and one count of contributing to the delinquency of a minor, which was later revoked for failure to comply with the conditions of that release. According to the report, the Defendant's diversionary sentence, which was not revoked until August 5, 2008, was still in effect at the time of these offenses. Some juvenile history was noted in the report.

The presentence report also reflected that the Defendant provided documentation that he received "a diploma of specialized education." The Defendant reported his mental health as fair, stating that he had a diagnosis of bipolar disorder at age seven, along with additional diagnoses of "ADD and ADHD." He reported his physical health as excellent. The

Defendant admitted to regular marijuana usage beginning as a juvenile. Additionally, the Defendant reported sporadic employment as a "floor cleaner," as a fast food worker, and as a brick mason.

Prior to hearing the arguments of counsel, the trial court asked both parties if they had any additional "evidence" to present, and both parties replied in the negative. The trial court then imposed a twenty-five-year sentence on each count.

### 1. Allocution

The Defendant contends the trial court did not allow him to speak before being sentenced, thus, effectively denying him his right to allocution. The State argues that the Defendant has waived appellate review of this issue because he never informed the trial court that he wished to make an allocution statement.

At the hearing, specifically, defense counsel was asked, "All right, . . . do you have any evidence?"; to which defense counsel responded, "No evidence, Your Honor, just argument." After hearing the arguments of counsel, the trial court noted that, in rendering its decision, it was required to look at "anything that the [D]efendant may have made on his own behalf[.]" At no time during the hearing did defense counsel or the Defendant inform the court of a desire to allocute. The Defendant assigned error to the issue in his motion for new trial. At the motion for new trial hearing, the trial court made the following findings:

> I am certain I never asked "Does the defendant wish to give an allocution or make a statement." I don't think there's any question. I don't think I ever ask for that but I feel 99.9% certain to ask whether or not the defense wishes to put on any evidence[.]

Defense counsel conceded that, "at no point in time[,] did [he] say the [D]efendant would like to give an allocution before sentencing." The trial court then determined that its actions did not deny the Defendant the right to give an allocution statement.

Tennessee Code Annotated section 40-35-210(b)(7) provides that in determining a defendant's sentence, the trial court shall consider any statement the defendant wants to make in his own behalf about sentencing. Often referred to as allocution, allocution has been defined as "the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994) (citation omitted). It is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." Black's Law Dictionary 75 (7th ed. 1999); see also United

-30-

States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001). "It is settled that a failure to comply with the mandate of [allocution] ordinarily requires vacation of the sentence imposed without a concomitant inquiry into prejudice. This is so precisely because the impact of the omission on a discretionary decision is usually enormously difficult to ascertain." State v. Keathly, 145 S.W.3d 123, 126 (Tenn. Crim. App. 2003) (quoting United States v. De Alba Pagan, 33 F.3d 125, 129-30 (1st Cir. 1994)) (footnotes omitted).

The State contends that the Defendant has waived this issue because he never informed the court that he wished to make an allocution statement. The Defendant relies on Keathly, 145 S.W.3d at 125-126, for the proposition that the trial court was required to inform him of his allocution right and invite him to speak, i.e., there must be evidence of an intentional relinquishment of a known right. However, the remainder of the cases relied on by the Defendant are all from federal circuit courts of appeal interpreting the analogous federal rule of criminal procedure. The Federal Rule of Criminal Procedure requires the judge to "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii) (formerly Fed. R. Crim. P. 32(a)(1)(c)). Such is not the rule in the State of Tennessee.

Moreover, in Keathly, 145 S.W.3d at 125-130, this court reversed a defendant's sentence where the trial court refused to allow the defendant to read a statement without being placed under oath and subject to cross-examination. In the case herein, unlike Keathly, the trial court did not refuse to allow the Defendant to make a statement. At the sentencing hearing, the trial court asked defense counsel if he wished to present any evidence, and defense counsel stated that he did not. The trial court did not prohibit the Defendant from addressing the court at that time. While the trial court admitted that it did not specifically ask the Defendant if he wished to allocute, he did not deny the Defendant the opportunity to do so. See, e.g., State v. Mark C. Noles, No. M2006-01534-CCA-R3-CD, 2007 WL 3274422, at *12 (Tenn. Crim. App. Nov. 6, 2007) (holding that the trial court did not refuse to allow the defendant to make a statement and that the defendant had the opportunity to do so). We conclude that the Defendant had the opportunity to make a statement and failed to do so. He is not entitled to relief on this issue.

### B. Length

The Defendant challenges the imposition of the maximum sentence on each count. The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Bise, 380 S.W.3d at 708.[5] Currently, upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to

---

[5] The Bise opinion was decided after the briefs were filed in this matter.

within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d) (emphasis added).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

The Defendant was a Range I, standard offender[6] who was convicted of two Class A felonies; therefore, he was subject to a sentence between fifteen and twenty-five years on each count. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court found that five enhancement factors applied to both of the Defendant's convictions: (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (4) the victim of the offense was particularly vulnerable because of age or physical or mental disability; (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; (13) at the time the felony was committed, the Defendant was released on probation; and (14) the Defendant abused a position of public or private trust. See Tenn. Code Ann. § 40-35-114(1), (4), (8), (13) & (14). The trial court also applied enhancement factor (6), "The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great[,]" to the child neglect conviction. See Tenn. Code Ann. § 40-35-114(6). The trial court then considered the Defendant's evidence in mitigation and found that none of those factors applied. See Tenn. Code Ann. § 40-35-113.

On appeal, the Defendant argues that trial court "erred in not finding any mitigation factors that were applicable to the Defendant and applying only enhancing factors that were not applicable to the Defendant." Specifically, he challenges the trial court's application of enhancement factor (1), arguing that the trial court improperly "gave great weight to the fact that the Defendant was using marijuana from the age of 12, for which he has never been convicted" and that "[s]uch evidence cannot be used to enhance a sentence[.]" However, the trial court properly considered the Defendant's admission in his presentence report that he began using marijuana at age twelve in support of his finding of enhancement factor (1). See State v. Anthony Riggs, No. M2007-02322-RM-CD, 2008 WL 1968826, at *4 (Tenn. Crim. App. May 7, 2008). We note that, regardless of this finding, the trial court also relied on the Defendant's record of criminal convictions in applying this factor.

The Defendant also challenges the application of enhancement factor (14), arguing that he was not in a position of trust because "he was not a live-in boyfriend at all, he was

_____

[6] The judgment form correctly notes that the Defendant is required to serve 100% of his sentence for aggravated child abuse. See Tenn. Code Ann. § 40-35-501(i)(2)(K).

a stop-by, fly[-]by, baby-daddy[.]" This argument borders on the absurd. Regardless of where the Defendant resided, it is clear that, as the victim's father, the Defendant was in a position of trust while the victim was in his care.

Finally, he argues that the trial court erred by refusing to apply mitigating factor (6), "The defendant, because of youth or old age, lacked substantial judgment in committing the offense[.]" See Tenn. Code Ann. 40-35-113(6). Ordinarily, "[i]n determining whether this factor is to be applied, courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 34 (Tenn. 1993). The trial court noted the Defendant's youth, being just shy of twenty years old at the time these crimes were committed, but further explained that the Defendant had been involved "in the criminal justice system for a long period of time." The trial court declined to apply this factor, concluding, "I think that while he is young at the same time he's demonstrated that he is someone that is of an older nature and has had significant exposure to the criminal justice system prior to this offense[.]" The Defendant argues that the trial court did not consider his "education, maturity, experience, mental capacity or development at all[,]" "basically stating that because of the Defendant's long criminal history [this factor] should not apply." The Defendant was familiar with the consequences of crime, as shown by his criminal history, which included multiple convictions as an adult and the commission of new offenses while on probation and bond. He presented no evidence that his mental capacity or development affected his ability to appreciate the nature of his conduct. See, e.g., State v. Cornelius O'Brien Love, No. W2010-00334-CCA-R3-CD, 2011 WL 977566, at * (Tenn. Crim. App. Mar. 21, 2011) (citing State v. Winston Chadrick McClain, No. M2002-02178-CCA-R3-CD, 2003 WL 21658592, at *6 (Tenn. Crim. App. July 15, 2003) (concluding that the trial court properly gave mitigation factor (6) "extremely little weight" because the fifteen-year-old defendant's lengthy and increasingly serious juvenile record indicated that he understood the nature of his conduct and because no evidence was offered to the contrary)).

These are the Defendant's only challenges to the imposition of the maximum sentence in his range. First, as discussed above, we conclude that the record supports the trial court's application of enhancement factors (1) and (14) to the Defendant's sentences. We further note that the trial court also properly applied a number of other factors to both of the Defendant's sentences, factors (4), (8), & (13),[7] and the record supports their application.

_____

[7] We cannot say that enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, was properly applied to the Defendant's aggravated child neglect sentence because serious bodily injury is an essential element of that offense. Tennessee Code Annotated section 40-35-114

(continued...)

Given the new directive of Bise from our supreme court, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Bise, 380 S.W.3d 707. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision; therefore, the imposition of the maximum sentence in the range is affirmed.

### C. Consecutive Nature

The Defendant also argues that the trial court erred by imposing consecutive sentencing. Initially, we note that the standard of review on the issue of consecutive sentencing is unclear under our State's current jurisprudence, given the recent pronouncement of our supreme court in Bise and further application of that standard to alternative sentencing determinations. See Bise, 380 S.W.3d at 708 (Tenn. 2012); see also State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). However, in the arena of consecutive sentencing, our supreme court has not issued a definitive ruling on the standard of review to be applied by this court. In response, some panels of this court are applying an abuse of discretion standard based upon the recent decisions of Bise and Caudle, while others are continuing to apply a de novo standard of review until instructed otherwise by our supreme court, and yet others are avoiding the standard of review altogether in deciding the issue. See generally State v. Robert Fusco, No. M2012-01068-CCA-RM-CD, 2012 WL 6062856, at *38-39 (Tenn. Crim. App. Dec. 06, 2012) (silent on standard of review to be applied), perm. app. denied, (Tenn. Apr. 11, 2013); State v. Eric Demond McCathern, No. M2011-01612-CCA-R3-CD, 2012 WL 5949096, at *4-5 (Tenn. Crim. App. Nov. 16, 2012) (majority applying abuse of discretion standard of review and concurring opinion advocating de novo standard of review), perm. app. denied, (Tenn. Feb. 25, 2013).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

---

[7](...continued)

specifically prohibits using enhancement factors that are elements of the offense, and our supreme court has held that "proof of serious bodily injury will always constitute proof of particularly great injury." State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994). However, the trial court applied only five factors to the aggravated child abuse sentence and still imposed the maximum twenty-five-year sentence.

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. However, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) & (4).

Here, the trial court clearly imposed consecutive sentences on two grounds: (1) the Defendant was an offender whose record of criminal activity was extensive; and (2) the Defendant was a dangerous offender whose behavior indicated little or no regard for human life, and no hesitation about committing a crime in which the risk to human life was high.[8] Tenn. Code Ann. § 40-35-115(b)(2) & (4). On appeal, the Defendant challenges only the trial court's application of the extensive criminal history criterion. Specifically, he asserts

---

[8] Regarding the imposition of consecutive sentences because the defendant is a dangerous offender, our supreme court has held, "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

that application of this criterion to him was improper, reasoning as follows: "The Defendant had only three prior instances of criminal behavior as an adult. . . . While those instances resulted in multiple convictions for multiple crimes, ultimately it was only three instances." The State replies that the trial court properly imposed consecutive sentences based on several criteria: the Defendant had an extensive criminal history; the Defendant was on probation at the time he committed these offenses; and the Defendant was a dangerous offender because of his previous crimes and the abuse and neglect in this case.

The evidence adduced at the sentencing hearing supports the trial court's conclusion that the Defendant was an offender who had an extensive record of criminal activity. The presentence report reflected that the Defendant had prior felony convictions for attempted aggravated robbery, aggravated assault, and burglary, and misdemeanors convictions for three counts of contributing to the delinquency of a minor and one count of use of a prohibited weapon. The Defendant was released on bond for the aggravated robbery, aggravated assault, and burglary charges,[9] and this offense occurred while he was released on that bond. Moreover, the Defendant had previously been granted judicial diversion, which was later revoked for failure to comply with the conditions of release. The Defendant's diversionary sentence was still in effect at the time of these offenses.[10] Morever, the trial court found that the Defendant "had some juvenile history as well, not significant but still involvement with the juvenile system." Some juvenile history was noted in the report. The trial court also noted the Defendant's admission to regular marijuana usage beginning as a juvenile. We disagree with the Defendant's argument that his "three instances" of criminal behavior were not sufficient to support application of this factor and conclude that the record supports the trial court's finding that the Defendant's record of criminal activity was extensive.

The trial court also found that the Defendant was a dangerous offender, first noting the Defendant's three prior violent felony convictions. The trial court recited the facts

---

[9] The State incorrectly asserts in its brief that the Defendant was on probation for the attempted aggravated robbery and aggravated assault convictions at the time he committed the instant offenses. It appears that this error comes from the following language contained in the presentence report: "The Defendant has served the four years [probation on the burglary offense] and the six years probation [for the attempted aggravated robbery and aggravated assault offenses] is in effect at this time, even though he is incarcerated at the Sullivan County Jail on the instant offense." However, the Defendant was on bond for all three offenses, including the burglary, not probation, at the time he committed the offenses herein. A disposition date of September 12, 2008, is reflected in the presentence report for all three of those offenses.

[10] Thus, it does appear that the Defendant was on diversion, a form of probation, at the time he committed the instant offenses. Another factor which likewise supports the imposition of consecutive sentences. However, the trial court noted that the Defendant was on probation twice during its consecutive sentencing ruling, but it never explicitly found that such factor applied.

leading to those convictions and characterized that situation as "highly dangerous." The trial court then recounted the circumstances of the present offenses, noting the severe injuries to the child, the age of the victim, the deliberate nature of the acts, the derogatory statements made concerning the child's paternity, and the Defendant's statements expressing curiosity about "slamming" the victim's head into a wall. The court also stated that the Defendant's behavior "evidenced little or no [regard] for human life"; that an extended sentence was necessary to protect the public against further criminal conduct by the Defendant; and that consecutive sentencing was reasonably related to the severity of the offenses committed. In our view, the record also supports a finding that consecutive sentences are warranted because the Defendant qualifies as a dangerous offender and the Wilkerson requirements have been met.

The presence of a single factor is enough to justify the imposition of consecutive sentencing. Under these facts and circumstances, consecutive sentencing is an appropriate and justly deserved sanction. Moreover, we note that the consecutive nature of these sentences appears to be consistent with applicable sentencing principles and guidelines. Based upon either standard of review, de novo or abuse of discretion, we affirm the trial court's imposition of consecutive sentencing.

CONCLUSION

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE